1

2

3

4

5    UNITED STATES DISTRICT COURT

6    EASTERN DISTRICT OF WASHINGTON

7    ESTATE OF W. SCOTT CREACH, by          NO:  CV-11-432-RMP
     and through IMOGENE CREACH,
8    Personal Representative; IMOGENE
     CREACH, individually and as Personal
9    Representative of the ESTATE OF W.
     SCOTT CREACH; ALAN CREACH;
10   ERNEST CREACH; SERENA               ORDER DENYING DEFENDANT
     LEONARD; and EDITH CARROLL,         BRIAN HIRZEL'S MOTION FOR
11   individually,                       SUMMARY JUDGMENT

12                   Plaintiffs,

13        v.

14   SPOKANE COUNTY
     WASHINGTON; BRIAN HIRZEL,
15   and OZZIE KNEZOVICH,

16                   Defendants.

17

18        This matter comes before the Court on Defendant Brian Hirzel's motion for

19   summary judgment, ECF No. 36.  The Court heard oral argument on January 11,

20   2013.  Richard Wall and Robert Crary appeared on behalf of Plaintiffs.  Stan

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 1

1  Bastian appeared for Defendant Brian Hirzel.  The Court has reviewed the relevant

2  filings and exhibits, and is fully informed.

3                                    FACTS

4         This case involves a Spokane County Deputy Sheriff's use of deadly force

5  against a seventy-four year-old man.  Plaintiffs in this action consist of Mr.

6  Creach's Estate and Mr. Creach's wife and children.  Plaintiffs filed suit against

7  Deputy Hirzel; Spokane County, Washington; and Spokane County Sheriff Ozzie

8  Knezovich for damages arising from the shooting.[1]  The undisputed facts are that

9  on August 25, 2010, Deputy Brian Hirzel was on night patrol when he conducted a

10 prowl check at a residence on East Fourth Avenue in Spokane Valley, Washington.

11 After conducting the prowl check, Deputy Hirzel drove to the nearby Plant Farm

12 and backed his unmarked police car into the gravel parking lot.  The time was

13 approximately 11:00 p.m.  ECF No. 38, at 1-2; ECF No. 50, at 2-3.

14        The Plant Farm is a plant nursery and gardening center owned by the Creach

15 family.  Due to the late hour, the Plant Farm was closed for business when Deputy

16 Hirzel pulled into the parking lot.  Deputy Hirzel did not alert the business owner

17 of his presence or request permission to be on the premises.  Wayne Scott Creach

18 and his wife, Imogene Creach, lived in a residence next door to the Plant Farm.

19 ECF No. 50, at 2; ECF No. 63, at 2.

_____

[1]  Spokane County provides law enforcement services to the City of Spokane

20 Valley, where Mr. Creach was shot.

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 2

1    Shortly after Deputy Hirzel's arrival on the premises, Mr. Creach became

2  aware of the vehicle parked in the Plant Farm parking lot.  Mr. Creach got out of

3  bed, put on a pair of pants and slippers, and obtained a flashlight and handgun from

4  inside the residence.  Mr. Creach then left the residence and approached Deputy

5  Hirzel's vehicle.  ECF No. 38, at 2-3; ECF No. 50, at 3; ECF No. 63, at 3.

6    The parties agree that Deputy Hirzel eventually exited his vehicle and fired a

7  single fatal shot into Mr. Creach's chest.  ECF No. 38 at 4-5; ECF No. 50, at 3.

8  However, the parties disagree as to the precise events that occurred in between Mr.

9  Creach leaving his residence and Deputy Hirzel firing the fatal shot.

10    Deputy Hirzel's version of the events was provided in a series of four

11  recorded interviews with detectives investigating the incident.  Deputy Hirzel

12  provided his first formal, recorded interview on September 3, 2010, nine days after

13  the shooting.  Deputy Hirzel's subsequent interviews took place on September 9,

14  2010, April 27, 2011, and May 24, 2011.  ECF No. 37.

15    Deputy Hirzel explained that he initially chose to back his vehicle into the

16  Plant Farm parking lot because he wanted to keep an eye on East Fourth Avenue

17  while he completed some paperwork on his onboard computer.  Deputy Hirzel

18  stated that he was sitting in the driver's seat of his unmarked car and working on a

19  ticket from earlier in the day when he saw a flash of light off to his left; he  looked

20  in the direction of the flash and saw a man approaching from approximately thirty

feet away.  The man was later identified as the decedent, Mr. Creach.  ECF No. 37, at 11, 18-19.

Deputy Hirzel stated that Mr. Creach was walking towards the rear of his vehicle at a right angle to the vehicle.  Deputy Hirzel further stated that his eyes met with Mr. Creach's eyes, and that Mr. Creach then turned towards the driver's side of the vehicle.  Deputy Hirzel recalled seeing that Mr. Creach was holding a firearm in his right hand pointed down towards the ground.  ECF No. 37, at 11.

Deputy Hirzel stated that he took his own gun from its holster and pointed it at Mr. Creach.  Deputy Hirzel, who was in his uniform at the time of the incident, stated that he remained in his vehicle after seeing Mr. Creach, and that he identified himself as a police officer and repeatedly told Mr. Creach to drop his weapon and stay back from the vehicle.  According to Deputy Hirzel, Mr. Creach responded that he did not have to drop his gun and continued walking towards the vehicle.  Deputy Hirzel recalled that Mr. Creach further stated "something to the effect" that Mr. Creach had "had things stolen."  Deputy Hirzel continued to tell Mr. Creach to "drop the gun" and "stay back" as Mr. Creach approached the vehicle.  ECF No. 37, at 11-12, 45.

According to Deputy Hirzel, Mr. Creach continued approaching Deputy Hirzel's vehicle and stopped only a few feet from the driver's side door.  Mr. Creach was still holding his gun down at his side and pointed towards the ground.

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 4

1    Deputy Hirzel stated that he again ordered Mr. Creach to "drop the gun" and to

2    "step away from the car."  Deputy Hirzel stated that he gave this command "at

3    least five times."  According to Deputy Hirzel, Mr. Creach responded that he did

4    not have to drop the gun and that he would not back away from the vehicle.  ECF

5    No. 37, at 12-13.

6            Deputy Hirzel told detectives that Mr. Creach eventually did place his gun in

7    the back waistband of his pants and backed away from the vehicle, although he did

8    not drop his weapon as he was directed.  Deputy Hirzel stated that he then exited

9    the vehicle with his gun still pointed at Mr. Creach.  Deputy Hirzel further stated

10   that he told Mr. Creach to "never walk up on a police officer with a gun in your

11   hand" and told Mr. Creach to keep his hands where he, Deputy Hirzel, could see

12   them.  Deputy Hirzel said he also ordered Mr. Creach to get on the ground several

13   times, but that Mr. Creach responded that he would not get on the ground.  ECF

14   No. 37, at 13-14, 27.

15           Deputy Hirzel recalled that he and Mr. Creach were "pretty much face to

16   face" at this time.  Deputy Hirzel stated that he took his baton out of its holster on

17   his left hip with his left hand, while still holding the gun in his right hand.  Deputy

18   Hirzel stated that he again told Mr. Creach to get on the ground and Mr. Creach

19   again refused.  Deputy Hirzel further stated that he then struck Mr. Creach on his

20   outer left knee, causing Mr. Creach to "kind of buckle[] down to his left a little."

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 5

Deputy Hirzel stated that he put his baton away after administering the strike.  ECF No. 37, at 14-15.

Deputy Hirzel claimed that Mr. Creach stood back up after the baton strike. Deputy Hirzel stated that he again told Mr. Creach to get down on the ground, and that Mr. Creach instead looked Deputy Hirzel in the eye and reached behind his back where he had placed his gun in his waistband.  Deputy Hirzel stated that he saw the grip of the gun in Mr. Creach's hand as Mr. Creach brought his hand out from behind his back.  Deputy Hirzel told detectives that he believed Mr. Creach was about to shoot him.  ECF No. 37, at 49.  Deputy Hirzel then fired a single shot into Mr. Creach's chest.  ECF No. 37, at 15-16.

Deputy Hirzel reported that he issued a call of shots fired on his radio and waited for other officers to arrive.  Mr. Creach was pronounced dead at the scene. ECF No. 52, at 38.

Plaintiffs allege causes of action against all defendants for violating Mr. Creach's civil rights under 42 U.S.C. § 1983 and for wrongful death under Washington law.  Plaintiffs additionally assert a claim against Spokane County for a practice or custom of excessive force under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Defendant Brian Hirzel moves for summary judgment on all claims against him, on the basis that he is protected from suit by the doctrine of qualified immunity.  ECF No. 36.

ANALYSIS

The doctrine of qualified immunity protects government officials, including police officers, from liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is "an immunity from suit rather than a mere defense to liability" and is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Thus, the court must resolve questions of qualified immunity "at the earliest possible stage in the litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

A police officer is entitled to qualified immunity in a § 1983 action unless (1) the facts, when taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right; and (2) the right was clearly established at the time of the alleged misconduct.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  Deputy Hirzel contends that his actions did not amount to a constitutional violation, and that even if a constitutional violation occurred, the right violated was not clearly established.

## A.    Whether a Constitutional Violation Occurred

The use of deadly force is a "seizure" subject to Fourth Amendment inquiry.

*Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The Supreme Court has established that an officer's use of force, including deadly force, violates a Fourth Amendment right if it is excessive under objective standards of reasonableness. *Scott v. Harris*, 550 U.S. 372, 382-83 (2007); *Acosta v. Hill*, 504 F.3d 1323, 1324 (9th Cir. 2007). When determining whether a particular use of force is "reasonable," courts must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the "countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Garner*, 471 U.S. at 8).

The Ninth Circuit applies a three step process to determine reasonableness in use of force cases. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). First, the court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Id.* (quoting *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010)). Even when an officer may have been justified in using some force, "the amount [of force] actually used may be excessive." *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

Second, the court must evaluate the government's interest in the use of force under the totality of the circumstances. *Id.* (citing *Graham*, 490 U.S. at 396). In *Graham*, the Supreme Court noted that courts should consider such factors as (1) the severity of the crime at issue; (2) whether the suspect posed an immediate

threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396. The most important of these factors is whether the suspect posed an immediate threat to the officer's safety or the safety of others.  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc).  In addition to the *Graham* factors, the Ninth Circuit has considered the availability of alternative methods of responding to the situation and whether warnings were given prior to the use of force.  *Smith*, 394 F.3d at 701*; Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).

Finally, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion."  *Glenn*, 673 F.3d at 871 (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  In applying this test, the court must keep in mind the perspective of a reasonable officer on the scene and recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97.  The Supreme Court has cautioned against use of the "20/20 vision of hindsight" in evaluating the circumstances facing the officer at the time of the shooting.  *Id.* at 396.

The Ninth Circuit has held repeatedly that summary judgment should be granted "sparingly" in excessive force cases because such cases "nearly always"

1   require a jury to sift through disputed factual contentions, draw inferences, and

2   make credibility determinations. *E.g.*, *Smith*, 394 F.3d at 701.

3          Deputy Hirzel contends that using deadly force against Mr. Creach was

4   objectively reasonable under the circumstances that confronted him.  Primarily

5   relying on his own recitation of the events, Deputy Hirzel states that the pertinent

6   facts are: (1) Deputy Hirzel was parked at the Plant Farm; (2) Mr. Creach

7   approached him armed with a handgun and did not identify himself; (3) Mr.

8   Creach did not comply with Deputy Hirzel's commands to get down on the ground

9   and drop his weapon; (4) Mr. Creach reached back for his gun, directly disobeying

10  Deputy Hirzel's orders; and (5) Deputy Hirzel feared for his life when he saw that

11  Mr. Creach was again reaching for his weapon.  ECF No. 39, at 8-9.

12         The Court notes that Deputy Hirzel's argument ignores a few facts that must

13  be considered when analyzing the events in the light most favorable to the

14  Plaintiffs.  First, Deputy Hirzel did not have permission to park in the Plant Farm

15  and did not alert anyone of his presence.  ECF No. 50, at 2; ECF No. 63, at 2.

16  Second, Deputy Hirzel was in an unmarked police vehicle.  ECF No. 38, at 1-2;

17  ECF No. 50, at 2-3.  Third, Deputy Hirzel was not investigating any crime at the

18  Plant Farm or the Creach residence.  ECF No. 50, at 3; ECF No. 63 at 3.  Fourth,

19  Mr. Creach was on his own property and apparently in lawful possession of the

20  handgun.  ECF No. 50, at 1; ECF No. 63, at.  Fifth, according to Deputy Hirzel's

own statements, early in the encounter Mr. Creach stated "something to the effect" that Mr. Creach had "had things stolen," arguably identifying himself as someone with an interest in the Plant Farm property.  ECF No. 37, at 12.  Finally, Mr. Creach did comply with Deputy Hirzel's commands to some degree by stepping back from the vehicle and placing the gun in the back waistband of his pants.  ECF No. 37, at 13.  In addition to pointing out these facts, Plaintiffs disagree with Deputy Hirzel's version of the events leading up to the shooting and urge this court to examine other evidence in the record that potentially undermines Deputy Hirzel's story.

The Ninth Circuit has recognized that courts should not simply accept what may be a self-serving account by a police officer in cases, such as this one, where the officer is the only surviving eyewitness.  *See Long v. City & County of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (citing *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).  As the Ninth Circuit stated in *Scott*:

> Deadly force cases pose a particularly difficult problem under [excessive force analysis] because the officer defendant is often the only surviving eyewitness.  Therefore, the judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.

39 F.3d at 915.  In such cases, the court "must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer, and the available physical evidence, as well as any expert testimony proffered by

1   the plaintiff, to determine whether the officer's story is internally consistent and

2   consistent with other known facts." *Id.* (citing *Hopkins v. Andaya*, 958 F.2d 881,

3   885-88 (9th Cir. 1992); *Ting v. United States*, 927 F.2d 1504, 1510-11 (9th Cir.

4   1991)).

5           Plaintiffs argue that Deputy Hirzel's story is not consistent with other known

6   facts and is not internally consistent.   Plaintiffs rely on the available forensic

7   evidence; reports of what other persons in the area did and did not hear on the

8   evening in question; Deputy Hirzel's discussion of the ambush training that he

9   received a few weeks prior to the incident; and Plaintiffs' own theory that the

10  evidence is most consistent with an accidental shooting rather than a purposeful

11  use of deadly force.  Plaintiffs additionally put forth an alternative theory that

12  Deputy Hirzel provoked Mr. Creach by striking him with his baton, and thus may

13  not rely on an otherwise defensive use of deadly force.

14          *i.     Forensic Evidence*

15          Plaintiffs point to several pieces of forensic evidence that, according to

16  Plaintiffs, materially contradict Deputy Hirzel's story.

17          First, forensic evidence in the record indicates that Mr. Creach may not have

18  been standing upright and face-to-face with Deputy Hirzel at the time he was shot,

19  as Deputy Hirzel claims.  An autopsy report prepared by Dr. John D. Howard of

20  the Spokane County Medical Examiner's Office states that the bullet entered

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 12

Mr. Creach's chest traveling from left to right and at a downward angle. ECF No.

52, at 41. In addition, Plaintiffs' expert, Dr. Jon Nordby, conducted a forensic

analysis based on the autopsy report, ballistics evidence, and blood spatter

evidence on Deputy Hirzel's pants and boots as well as on Mr. Creach's hands.

From these sources, Dr. Nordby concluded that the shooting occurred at an

incidence angle of 42.2 degrees and an azimuth angle of 55.5 degrees. ECF No.

53, at 71. Mr. Creach and Deputy Hirzel were approximately the same height.

ECF No. 57, at 159. Dr. Nordby created a reconstruction of the scene from the

evidence and concluded that Mr. Creach was likely in a kneeling position while

bent forward at a slight angle at the time that he was shot. ECF No. 53, at 71; ECF

No. 54, at 79.

Second, forensic evidence indicates that Mr. Creach may not have been

reaching behind his back at the time that he was shot. In his forensic analysis, Dr.

Nordby concluded from the presence of small impact bloodstains on Mr. Creach's

left and right hands that both of Mr. Creach's hands must have been in front of him

and below his chest at the time of the shooting. ECF No. 52, at 63-64. Plaintiffs

argue that this is inconsistent with Deputy Hirzel's statements that Mr. Creach was

reaching behind his back and pulling out his gun from his rear waistband when

Deputy Hirzel fired the shot.

Third, forensic evidence arguably indicates that Mr. Creach had not brought his gun out from his rear waistband at the time that he was shot.  A report from Kristi Barr, Forensic Scientist with the Washington State Patrol Crime Laboratory, indicates that no blood was detected on Mr. Creach's pistol.  ECF No. 55, at 95.  Plaintiffs argue that there would have been blood spatter on the pistol if Mr. Creach had, in fact, brought the gun out from behind his back at the time of the shooting.

In response, Deputy Hirzel offers several arguments to explain how the forensic evidence fits his story.  Deputy Hirzel argues that the downward angle of the gunshot could be consistent with his story because Deputy Hirzel said 1) that Mr. Creach was reaching for his gun when he was shot, and 2) that Deputy Hirzel had struck Mr. Creach with his baton prior to the shooting.  Thus, according to Deputy Hirzel, Mr. Creach could have been leaning over or buckling at the time of the shot, which would explain a slight downward angle in the gunshot trajectory.  However, Deputy Hirzel's argument is inconsistent with statements he gave to detectives investigating the shooting.  Deputy Hirzel repeatedly told detectives over the course of several interviews that Mr. Creach stood all the way back up after the baton strike and that the deputy and decedent were standing face to face at the time of the shooting.  ECF No. 37, at 14-15, 91, 115-16.

/ / /

Deputy Hirzel further argues that the blood spatter evidence is not necessarily inconsistent with his story.  Deputy Hirzel theorizes that a small amount of blood spatter could have landed on Mr. Creach's right hand because Mr. Creach was drawing the gun out from behind his back when he was shot.  Deputy Hirzel further theorizes that blood splatters may not have reached Mr. Creach's firearm because Mr. Creach had only just begun to bring his gun out from behind his back at the time that he was shot.

Deputy Hirzel's attempt to explain the seemingly contradictory forensic evidence only serves to illustrate that there are genuine issues of fact surrounding the shooting that a jury must determine.  A jury could conclude from the forensic evidence that the parties were not in the relative positions that Deputy Hirzel says they were in at the time of the shooting.

### ii.    *Reports of what others in the neighborhood heard*

Plaintiffs have produced evidence showing that nobody in the neighborhood reported hearing the repeated commands that Deputy Hirzel says he gave before shooting Mr. Creach.  Deputy Hirzel stated that he repeatedly told Mr. Creach to "drop the gun" and "stay back" when he first observed Mr. Creach approaching the car; that he continued giving those commands as Mr. Creach walked towards the vehicle; that when Mr. Creach was at the driver's side door of the vehicle, Deputy Hirzel ordered Mr. Creach to "drop the gun" and "step away from the car" at least

five times; that after Deputy Hirzel exited his vehicle, he told Mr. Creach to "never walk up on a police officer with a gun in your hand" and told Mr. Creach to keep his hands where Deputy Hirzel could see them; and that Deputy Hirzel told Mr. Creach to get down on the ground several times before striking Mr. Creach with the baton and told him again at least once more after the baton strike. Deputy Hirzel further stated that Mr. Creach gave numerous responses to these commands.

Deputy Hirzel stated that he gave these commands in a firm, assertive voice such that it would have been easy for Mr. Creach to hear him, including when Deputy Hirzel first observed Mr. Creach approaching from approximately thirty feet away. ECF No. 37, at 26, 78-79, 117-20. Deputy Hirzel further stated that Mr. Creach was speaking in an assertive voice and that both he and Mr. Creach were perhaps speaking "slightly louder than normal." ECF No. 37, at 33. In addition, Deputy Hirzel characterized Mr. Creach's demeanor as "very defiant and angry" throughout the encounter. ECF No. 37, at 24.

An investigative report prepared by Detective Brian Hamond of the Spokane Police Department noted that many persons who lived in the neighborhood of the shooting reported hearing one or more gunshots during the time of the shooting, but that none of them reported hearing commands or additional voices prior to the shooting. ECF No. 57, at 157. Additionally Plaintiffs produced a declaration from Imogene Creach, Mr. Creach's wife, stating that she had gotten out of bed to look

for her husband just moments before the shooting and heard only one single, short

"exclamation" immediately prior to the gunshot and did not hear any other

commands or verbal responses.  ECF No. 49-1.

Mrs. Creach explained that the bedroom that she and her husband shared has

two windows that face the Plant Farm parking lot where the shooting occurred, and

that on the night of the shooting they had a window open in the bedroom and

another window open in a bathroom connected to the bedroom because it was a

warm evening.  ECF No. 49-1.  Plaintiffs also produced an affidavit from Richard

Courser, whose home is located across the street from the Plant Farm, stating that

the windows in his home that faced the Plant Farm were open on that night; that he

was awake and at his computer when he heard a gunshot; and that prior to the

gunshot he had not heard any voices coming from the direction of the Plant Farm.

ECF No. 49-2.

In response, Deputy Hirzel argues that the fact that nobody heard his

commands or Mr. Creach's responses does not mean that the commands were not

given.  In addition, Deputy Hirzel characterizes Detective Hamond's report as

indicating that nobody was in a position to hear the commands.  This is not entirely

accurate.  Detective Hamond's report indicates that Mrs. Creach heard a single

short exclamation right before the shot and that "[n]one of the subjects who heard

the gunshot reported hearing a startled voice *including people who were in the*

*position to do so*; most notably the residents at [address redacted] or the nearest

neighbors." ECF No. 57, at 157 (emphasis added). Detective Hamond did go on

to conclude in his report, based on seemingly flawed reasoning, that sound testing

in the area was unlikely to yield valid results. Detective Hamond appeared to

assume 1) that the commands were given; and 2) that Mrs. Creach was in the best

position to hear the commands because she heard the something that nobody else

had heard, the startled exclamation. Detective Hamond then concluded that

because Mrs. Creach did not in fact hear the commands, then nobody could have

heard the commands. Detective Hamond's report begs the question of whether

there were any commands given.

   That multiple persons believed that they would have heard an exchange of

voices had it occurred, but did not in fact hear any such voices prior to the

shooting, raises a genuine issue of material fact regarding Deputy Hirzel's

assertions that he gave many commands in a firm, assertive voice, that both he and

Mr. Creach were talking somewhat louder than normal, that some of the

commands were apparently given at an approximate distance of thirty feet, and that

Mr. Creach was acting in an angry and defiant manner throughout the encounter.

While the fact that nobody heard the commands or Mr. Creach's responses does

not necessarily mean that Deputy Hirzel's recitation of the facts is inaccurate or

untrue, the record creates genuine issues of material fact that the jury must decide.

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 18

1        *iii.    Deputy Hirzel's ambush training*

2        Spokane police officers, including Deputy Hirzel, received ambush training

3    just a few months before Deputy Hirzel's encounter with Mr. Creach.  In the

4    training scenario, a shooter approached the police officer as he sat in his squad car

5    and began firing on the officer.  The officers were trained to immediately fire back

6    from inside their vehicle.  ECF No. 37, at 58-59.

7        Deputy Hirzel told the detectives that his encounter with Mr. Creach was

8    "pretty much identical" to the scenario in the ambush training.  However, Deputy

9    Hirzel went on to explain that he did not react in accordance with the ambush

10   training because the ambush training involved a suspect who immediately fired on

11   the officer.  ECF No. 37, at 58-59.

12       Based on Deputy Hirzel's statement that the ambush training was "pretty

13   much identical" to his situation with Mr. Creach, Plaintiffs challenge Deputy

14   Hirzel's version of the events and argue that Deputy Hirzel may have begun

15   shooting at Mr. Creach immediately upon seeing him, in accordance with the

16   ambush training that he received.

17       In response, Deputy Hirzel explains that the situation was actually different

18   from the ambush training that he received, and that that was why he did not begin

19   shooting immediately.  Deputy Hirzel further argues that Plaintiffs' theory cannot

20   defeat summary judgment because a party may not prevail against a motion for

1  summary judgment simply by showing "that there is some metaphysical doubt as

2  to the material facts." *T.W. Elec. Serv.*, 809 F.2d at 630 (quoting *Matsushita Elec.*

3  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Plaintiffs' theory

4  about the ambush training would not defeat summary judgment by itself, but it

5  provides support for Plaintiffs' argument that Deputy Hirzel's story is not

6  internally consistent.

7          iv.     *Evidence indicating an accidental shooting*

8          Deputy Hirzel told detectives that he was holding his firearm in his right

9  hand and the baton in his left hand when he struck Mr. Creach with the baton.

10  ECF No. 37, at 14-15, 47, 86-95.  Plaintiffs' theory is that Deputy Hirzel

11  accidentally shot Mr. Creach with his firearm at the same time, or nearly the same

12  time, as administering the baton strike.

13          Deputy Hirzel acknowledged that he had never used his baton while holding

14  his firearm before, that he was not trained to engage in that practice, and that it was

15  "not very common" and "unorthodox" to strike someone with a baton while

16  holding a gun.  Deputy Hirzel explained that he nevertheless used this technique on

17  Mr. Creach because he had to adapt to the situation that confronted him.  ECF No.

18  37, at 56, 86-88, 94.

19          Plaintiffs presented statements from Spokane County training instructor

20  Justin Elliott and an expert report from D.P. Van Blaricom, a retired police chief.

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 20

1    Mr. Elliott testified in a deposition that the simultaneous use of a baton while

2    wielding a firearm is discouraged in police training because of the risk that a

3    "sympathetic response" will occur.  A "sympathetic response" occurs when

4    manipulating a weapon in one hand causes the other hand to constrict.  Mr. Elliott

5    further explained that police officers are never trained to engage in concurrent use

6    of a gun and a baton because it is very difficult to do two things at the same time in

7    a high-stress situation.  ECF No. 56, at 144-48.

8        Mr. Van Blaricom similarly noted that police officers are advised against

9    using a weapon held in one hand while holding another weapon in their other hand

10   because of the risk that the officer will accidentally utilize both weapons.  Mr. Van

11   Blaricom further noted that Deputy Hirzel filed only a single shot at Mr. Creach.

12   In Mr. Van Blaricom's opinion, this fact supports an accidental shooting theory

13   because officers are trained to fire multiple shots when they believe that deadly

14   force is about to be used against them.  Mr. Van Blaricom concluded from his

15   review of the case that it is more probable than not that Deputy Hirzel

16   unintentionally discharged his firearm in his right hand while striking Mr. Creach

17   with the baton in his left hand.  ECF No. 55, at 90-92.

18       Deputy Hirzel disputes Plaintiffs' contention that the shooting was

19   accidental.   Deputy Hirzel further argues that even if the shooting were accidental,

20   he would still be entitled to summary judgment because a police officer's

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 21

accidental use of force does not give rise to a Fourth Amendment violation.

Before a court analyzes whether an officer's use of force was reasonable under the Fourth Amendment, it must first be established that a seizure actually occurred. *See Scott*, 550 U.S. at 381. In *Brower v. County of Inyo*, the Supreme Court explained that a Fourth Amendment seizure "requires an intentional acquisition of physical control." 489 U.S. 593, 596 (1986). Thus, a "seizure" occurs only "when there is a governmental termination of freedom of movement *through means intentionally applied*." *Id.* at 596-97.

*Brower*'s language might suggest that any accidental use of force would not constitute a Fourth Amendment seizure, but the analysis is not that simple. *Brower* itself dealt with a situation where a suspect in a high-speed chase was killed when he crashed into a roadblock that police officers had created to stop his vehicle. *Id.* at 594. The Ninth Circuit Court of Appeals held that no seizure had occurred under the Fourth Amendment because, in its view, the case was analogous to a situation where a suspect unexpectedly loses control of his car during a police chase and crashes. *Id.* at 595. The Supreme Court reversed and held that the suspect was seized when his car crashed into the roadblock. *Id.* at 599-600.

The *Brower* Court explained that a roadblock is "designed to produce a stop by physical impact if voluntary compliance does not occur," and that it did not matter whether the police subjectively intended for the roadblock to stop the driver

or cause a collision. *Id.* at 598. The Court further reasoned that it "could not draw too fine a line" in determining whether the means that actually terminated the person's freedom of movement was the "very means that the government intended." *Id.* at 598-99. Otherwise, the Court explained, "we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was only meant to be bludgeoned, or by a bullet in the heart that was meant only for the leg." *Id.* Thus the Court concluded:

> We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped.

*Id.* at 599.

In *Torres v. City of Madera*, the Ninth Circuit was confronted with a scenario where a police officer meant to employ a Taser on an arrestee sitting in the back of a patrol car, but instead employed his service weapon, killing the arrestee. 524 F.3d 1053, 1054-55 (9th Cir. 2008). The district court found that the officer's actions did not constitute a seizure. *Id.* at 1055. The Ninth Circuit reversed, finding that its "continuing seizure" rule applied because the arrestee was handcuffed and placed in the back of the squad car prior to the officer's conduct. *Id.* at 1055-56. The "continuing seizure" rule provides that "once a seizure has occurred, it continues throughout the time the arrestee is in the custody of the

arresting officers." *Id.* at 1056 (quoting *Robins v. Harum*, 773 F.2d 1004, 1010 (9th Cir. 1985)).  The Ninth Circuit thus concluded that the relevant inquiry was "whether the officer's mistake in using the Glock rather than the Taser was objectively unreasonable." *Id.* (quoting *Henry v. Purnell*, 501 F.3d 374, 384 (4th Cir. 2007)); *see also Henry*, 501 F.3d at 381-82 (holding that police officer's mistaken use of his firearm rather than his Taser constituted a Fourth Amendment seizure even without applying a continuing seizure rule).

The Ninth Circuit identified five factors that are relevant to the determination of whether such a mistake is unreasonable: "(1) the nature of the training the officer had received to prevent incidents like this from happening; (2) whether the officer acted in accordance with that training; (3) whether following that training would have alerted the officer that he was holding a handgun; (4) whether the defendant's conduct heightened the officer's sense of danger; and (5) whether the defendant's conduct caused the officer to act with undue haste and inconsistently with that training." *Id.* at 1057 (citing *Henry*, 501 F.3d at 383).

In this case, an accidental shooting could constitute a seizure under the Fourth Amendment because Mr. Creach was previously seized when Deputy Hirzel identified himself as a police officer and ordered Mr. Creach to the ground in an authoritative tone.  *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) (a seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk

away"). Deputy Hirzel's act of striking Mr. Creach with his baton also constituted a prior seizure. *See Young v. County of Los Angeles*, 655 F.3d 1156, 1161-62 (9th Cir. 2011). Thus the mistaken use of deadly force, if it occurred, would be subject to the Fourth Amendment reasonableness standard under the circumstances of this case. *See Torres*, 524 F.3d at 1056-57.

Based on the evidence in the record, the Court concludes that a reasonable jury could find that material components of Deputy Hirzel's story are inconsistent. Because of material factual disputes in what occurred leading up to the shooting, the Court cannot properly assess the government's interest in the use of force and whether that use of force was objectively reasonable under the circumstances.

Similarly the Court cannot assess Plaintiffs' accidental shooting theory because there are material issues of fact regarding whether the shooting was accidental and, if it was accidental, whether Deputy Hirzel's mistaken use of his gun along with the baton was objectively unreasonable. This is precisely the type of case where a jury must make credibility determinations, sift through the disputed factual contentions, and draw inferences therefrom to determine whether Deputy Hirzel's actions were reasonable. *See Smith*, 394 F.3d at 701.

The Court will not grant summary judgment on Plaintiffs' provocation theory for similar reasons. The Ninth Circuit has held that "where an officer intentionally or recklessly provokes a violent confrontation, if the provocation is an

1   independent Fourth Amendment violation, he may be held liable for his otherwise

2   defensive use of deadly force."  *Glenn*, 673 F.3d at 879 (quoting *Billington v.*

3   *Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)).  The Court cannot assess whether

4   Deputy Hirzel's conduct in striking Mr. Creach with his baton constituted an

5   independent Fourth Amendment violation or whether the baton strike intentionally

6   or recklessly provoked a violent confrontation because material facts surrounding

7   the baton strike are in dispute.

8        **B.     Whether the right was clearly established**

9        Even where a constitutional violation has occurred, qualified immunity

10  shields an officer from suit when the right was not "clearly established" at the time

11  of the officer's conduct.  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  A right is

12  clearly established if a reasonable officer would understand that his conduct was

13  unlawful under the circumstances that confronted him.  *Saucier*, 533 U.S. at 202;

14  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Thus "[q]ualified immunity

15  operates . . . to protect officers from the sometimes hazy border between excessive

16  and acceptable force."  *Saucier*, 533 U.S. at 206 (internal quotation omitted).  The

17  inquiry "must be undertaken in light of the specific context of the case."  *Id.* at 201.

18       However, a police officer can still be on notice that his conduct violates

19  established law "even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S.

20  730, 741 (2002).  Otherwise an officer could escape liability for even the most

egregious acts "simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct." *Deorle*, 272 F.3d at 1286. In an "obvious case," general standards may serve the basis for finding that a right was clearly established. *Brosseau*, 543 U.S. at 199. The use of deadly force is constitutionally permissible when an officer "has probable cause to believe that the suspect poses a threat of serious physical harm" to the officer or others. *Garner*, 471 U.S. at 11.

Deputy Hirzel contends that Plaintiffs have not shown that he violated a clearly established right. Deputy Hirzel's argument primarily relies on Plaintiffs' failure to produce another controlling case directly analogous to the factual scenario presented here. The problem with Deputy Hirzel's argument is that the Court simply does not know what the facts are. As discussed previously, there exist genuine issues of material fact casting doubt on key components of Deputy Hirzel's version of the events. Therefore, summary judgment on the grounds of qualified immunity is not appropriate. *See, e.g.*, *Espinosa*, 598 F.3d at 532 (affirming denial of summary judgment because "there are genuine issues of fact regarding whether the officers violated [the plaintiff's] Fourth Amendment rights . . . [that] are also material to a proper determination of the reasonableness of the officers' belief in the legality of their actions").

/ / /

1    Summary judgment is inappropriate on Plaintiffs' wrongful death action for

2 similar reasons.  Just as the Court cannot determine whether Deputy Hirzel's use of

3 deadly force was reasonable under the circumstances, material issues of fact

4 preclude a finding that Mr. Creach's death was not wrongful.  *See Estate of Lee v.*

5 *City of Spokane*, 101 Wn. App. 158 (2000).

6    Accordingly, Defendant Hirzel's motion for summary judgment, **ECF No.**

7 **36**, is **DENIED**.

8    The District Court Clerk is directed to enter this Order and provide copies to

9 counsel.

10    DATED this 4th day of February 2013.

11

12                                    *s/ Rosanna Malouf Peterson*

13                              ROSANNA MALOUF PETERSON
                              Chief United States District Court Judge

14

15

16

17

18

19

20